# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 6, 2012 Session

## STATE OF TENNESSEE v. ANDREW HAYES

### Appeal from the Criminal Court for Shelby County
### No. 08-03864    Carolyn Wade Blackett, Judge

No. W2010-02641-CCA-R3-CD  - Filed August 6, 2012

The defendant, Andrew Hayes, appeals his Shelby County Criminal Court jury convictions of felony murder and aggravated robbery, claiming that the trial court erred by admitting certain evidence, that the trial court erred by denying his motion to suppress the statements he made to police, that the evidence was insufficient to support his convictions, and that the trial court committed plain error in its instructions to the jury. Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Lance R. Chism (on appeal); and Coleman Garrett and David Stowers (at trial), Memphis, Tennessee, for the appellant, Andrew Hayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham and Jennifer Morris, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The defendant's convictions in this case relate to the August 2007 beating death of the victim, Danny Harris, whose badly-decayed corpse was discovered inside his Memphis apartment on October 26, 2007.

At trial, Janice Jefferson, who testified that she was more commonly known as "Snow" and sometimes known as Janice May, said that in August 2007 she lived at 1651

Depass Street in Memphis along with the defendant, her daughter, Chawonna Jefferson, and her sons, John Jefferson and Tamarion Jefferson.[1] Snow testified that the defendant, who had "a nervous condition," was dating her daughter and that he helped pay the rent with his disability proceeds. She said that he also did "a little work on the side" for a neighborhood grocer.

Snow testified that, toward the end of August 2007, Sarah Lucas and her boyfriend, an Hispanic man named "Miguel," moved into the Depass Street residence because Ms. Jefferson and the defendant were preparing to move out. Tammy Vance, Sarah Lucas' mother, also moved in for a brief time, telling Snow that she needed a place to stay while her boyfriend, the victim, "was in rehab." Snow recalled that Ms. Vance "had a black eye and like a deep scratch mark on her forehead" and that she claimed that the victim "had hit her in the eye because he was drinking and that's what made him go in rehab." Snow said that the two women drove "a real nice truck" with four doors during the time that they lived in the Depass Street residence and that the women told her that the victim had given them permission to drive the vehicle during his stint in rehabilitation.

Ms. Jefferson and the defendant did not move as planned but continued to live in the house along with Ms. Vance, Ms. Lucas, and Miguel. In October, Snow asked Ms. Lucas, Ms. Vance, and Miguel to move out of the house "because they couldn't pay on the utility bill." Snow said that Ms. Vance was the first to leave the residence, but before she left, Ms. Vance offered to compensate Snow with "some groceries and . . . some Icehouse beer." Later, Ms. Vance "brought in . . . a TV" that she claimed had been given to her by "a lady around the corner." Finally, Ms. Vance brought in a handgun and offered it as payment to Snow; later, she asked Snow to help her sell the gun as well as the victim's truck, telling Snow that the victim "was going to be in rehab longer than she thought and he told her to go sell the gun to get her some food and stuff." Snow acknowledged that she directed Ms. Vance to "Wheelchair John" to sell the gun. Snow testified, at that point, that she became concerned about Ms. Vance's selling the victim's possessions, so she telephoned the police.

On Halloween, Snow met police officers at a nearby Mapco convenience store, where they had Ms. Vance "surrounded" in the victim's truck. She led officers to the Depass Street residence and told them about the items Ms. Vance had given in exchange for rent. Snow testified that she granted officers permission to search the residence.

Snow testified during cross-examination that she never saw the defendant in

[1]Because all of the other witnesses referred to Janice Jefferson as "Snow" during their testimony and because both Janice Jefferson and Chawonna Jefferson testified at trial, we will refer to the witness as "Snow" to avoid confusion.

possession of any item belonging to the victim and that she had no personal knowledge of the defendant's being involved in the victim's murder. She said that as far as she knew, the defendant had no relationship with either Ms. Vance or Ms. Lucas and had not met them prior to the women's moving into the Depass Street residence.

Snow testified that on Halloween, she was driven to the police station to give a statement, and the defendant followed in a borrowed car to give her "a ride back home." She said that they left at approximately seven that evening and that officers returned to her residence on November 2, "and that's when they kept" the defendant. On November 2, she returned to the police station during the early morning hours at the request of homicide detectives, and when she arrived, the defendant "screamed out" to her, "I love you, momma, take care of my baby." Snow said that police told her that the defendant had implicated her in the victim's murder, and she asked the defendant why he had lied.

Sarah Lucas testified that in August 2007, she moved from her Cecilia Street residence to Snow's Depass Street residence because she did not like the living conditions at the Cecilia Street residence. She said that she knew the defendant only as "Snow's son-in-law" and that the victim "was a man that [her] mother lived with." She described the victim as "a very, very nice man." Ms. Lucas testified that sometime in the beginning of August, her mother, Tammy Vance, came to her Cecilia Street residence bleeding from a cut on her head. She said that Ms. Vance, who was driving the victim's truck, told her that the victim had struck her and that he had decided to enter "rehab because he was drinking too much and smoking too much cigarettes." She said that she and her mother moved in with Snow "[a]bout two weeks" later. Ms. Lucas recalled that Ms. Vance gave Ms. Lucas' boyfriend "a DVD/TV type deal" for his birthday and that she did not believe the item belonged to Ms. Vance. She said that Ms. Vance also brought "a big huge TV" to Snow's residence in the back of the victim's truck.

Ms. Lucas testified that she first learned of the victim's death when police arrived to take her in for questioning. She said police told her that the victim had been murdered inside his apartment. She said that police took her in for questioning because she had pawned a "DVD/VCR" that belonged to the victim. She testified that she pawned the item at her mother's behest and that Ms. Vance told her that the victim had given his permission for the item to be pawned. She said she knew nothing about the victim's murder.

During cross-examination, Ms. Lucas testified that she came to testify at trial because Ms. Vance had implicated her in the victim's murder, saying that she wanted to "clear [her] name" and to "get justice for" the victim. She said that Ms. Vance had implicated her in the victim's murder "[b]ecause she's crazy." She acknowledged that Ms. Vance was in prison for the victim's murder. Ms. Lucas said that she had no knowledge of

the defendant's playing any role in the victim's murder.

Ms. Lucas conceded that the prosecutor had "cleared . . . up" the outstanding warrants for drug possession and prostitution that she had when she moved to Texas in 2008. She admitted that she went to Arkansas to obtain an identification card but denied that she went with the victim and Ms. Vance to do so. Ms. Lucas said that Ms. Vance asked to stay with her in August 2007 because "[s]he didn't want to stay by herself across town." To her knowledge, Ms. Vance and the defendant did not have any type of personal relationship.

Leslie Kinnard, an employee at Woodchase Apartments in 2007, testified that in September of that year, she was directed to verify that the victim was still living in his apartment because the rent had not been paid. Ms. Kinnard said that she knocked on the door, and when she got no answer, she "peep[ed]" inside the door and saw that the furniture was still in the apartment. She said that after the victim failed to pay his rent by the 15th of October, the victim "was scheduled for a set out" at the end of the month. Ms. Kinnard said that after following the appropriate legal procedure to evict the victim, she went to the victim's apartment with two sheriff's deputies and the property manager. The deputies entered the apartment first, and they came out and told Ms. Kinnard that the victim was deceased inside the apartment.

Shelby County Sheriff's Department Deputy Stanley Gibson testified that he went to the victim's apartment to assist with an eviction on October 26, 2007. When he entered the apartment, he noticed that the bedroom door was shut and that a towel or sheet had been placed at the bottom of the door. He and his partner "popped the door open" and "observed a body lying in bed" and smelled a strong odor. Deputy Gibson said that upon seeing the body, they left the apartment, secured the door behind them, and contacted their supervisors.

Memphis Police Department ("MPD") Officer Milton Gonzalez testified that on October 31, 2007, his office received a call that the victim's vehicle had been spotted in the "Jackson/Orchi" area of Memphis. As he went to that location, he saw the vehicle being driven by a white female. When the vehicle turned into the Mapco station, Officer Gonzalez initiated a traffic stop and removed the driver from the vehicle. The driver identified herself as "Tammy" and told officers that she was the victim's girlfriend. The vehicle was towed to the police station, and the driver was placed under arrest.

MPD Officer John Pasley testified that the victim's truck was seized and Ms. Vance arrested at the Mapco station. He said that as the officers waited for homicide detectives to arrive, Snow and Ms. Jefferson approached him and said that "they knew something about the case" and that Ms. Vance "had left some items in their home that they

-4-

thought [police] might be interested in." He followed the women to their residence, where Snow showed him "a TV, a cell phone, and a little notebook journal" that she believed had belonged to the victim. Officer Pasley said that he then telephoned homicide detectives, who told him to call the crime scene unit to photograph and collect the items. Officer Pasley testified that he drove Snow and Ms. Jefferson to the police station and that the defendant followed driving a separate vehicle. He then went to pick up Ms. Lucas, her boyfriend, and Wayne Bobo. Unable to locate Mr. Bobo, he transported Ms. Lucas and her boyfriend to the police station.

On the following day, he and Sergeant Nelson met with John Watkins, who was also known as "Big John" and who was confined to a wheelchair, based on information they had that the victim's handgun had been sold to Big John. They recovered the victim's weapon from Big John.

Bureau of Alcohol, Tobacco, and Firearms Agent Richard Howard testified that the Sig Sauer .40 caliber handgun recovered by Officer Pasley had been purchased by the victim on October 31, 2000.

MPD Crime Scene Investigator Jeffrey Alan Garey testified that when he arrived at the victim's apartment, "[t]he victim was laying on his back, on a bed, his left leg was hanging off the left side of the bed, foot touching the floor. The body was in a severe state of decomposition. There were flies throughout, maggots all over the body and the bedding." Investigator Garey testified that he collected a Sigarms "gunbox," a piece of mail postmarked August 14, 2007, a partial loaf of bread that bore an expiration date of August 17, bloody sheet rock and paint samples, three rings from the dresser, "an instruction manual for a Hitachi DVD player with video cassette recorder," and the sheets, pillows, and pillow cases from the bed where the victim's body was discovered. He photographed "an unidentified light spot with other lighter speckled spots on the carpet" in the bedroom, "possible blood spatter" on the south wall of the living room, "a corner of a wall area" that appeared to have "a blood print," a door jam "where a possible bloody print was located," and "blood spatter on two separate walls in the bedroom."

MPD Lieutenant Bart Ragland testified that Lieutenant Mason, who was the lead investigator, asked him and Sergeant Parks "to go out and pick up" Ms. Vance, Snow, Ms. Jefferson, and the defendant. He said they were not suspects and that they drove to the police station in their own car. Lieutenant Ragland testified that he and Sergeant Parks interviewed the defendant, who they believed had relevant information "[b]ecause of his involvement with Tammy Vance and her daughter." During that first interview, the defendant's "story kept changing and changing and changing." Lieutenant Ragland said that at that point, "it became obvious . . . that he knew more than he was telling . . . and that he

had more involvement than just being a witness," so they provided the defendant with *Miranda* warnings. The defendant had some difficulty reading the advice of rights form, so Lieutenant Ragland "read the entire thing to him and he understood it and we went over it." The defendant executed a written waiver of his rights at 3:15 p.m. on November 2, 2007, and he provided a statement at 5:57 p.m. that same day implicating Ms. Vance in the victim's murder, telling officers that he traveled with Ms. Vance and Ms. Lucas's boyfriend, Miguel, to an apartment in Cordova to get a 36 inch television. The defendant told officers that he opened a closed bedroom door inside the apartment because he "smelled the foul odor" and that he saw the victim's "body laying in the bed." He said Ms. Vance told him "not to worry" about the body because she and Miguel "were going to take care of it." The defendant described the body as "a white male, he was laying on his left side. He was about in his mid-fifties. He was medium build. His skin was turning black. His hair was brown, and he had a mustache, too." He said that he did not notice anything in the victim's mouth or any blood in the room. He said that he and Miguel loaded the television into the victim's truck and that Ms. Vance also removed "a VCR and a DVD player that was built together and DVD movies." He said that they left the victim's apartment and traveled back to the Depass Street residence to pick up Ms. Lucas so that Ms. Lucas could pawn the items. The defendant told Lieutenant Ragland that he did not tell anyone about seeing the corpse in the apartment because he was afraid that he would be charged with the victim's murder because he had helped move the television.

Lieutenant Ragland said the fact that the defendant was able to describe the victim as a white male was suspicious because "the state of decomposition of the victim at the time" made it difficult "to tell that was indeed a male white." Lieutenant Ragland said that he spoke with the defendant on a second occasion and that the defendant "gave a statement, but he stopped. . . . And he refused to sign the statement." Between the giving of the two statements, Lieutenant Mullins "interviewed" the defendant, and "it became apparent that he had more involvement" than he had originally admitted. During the taking of the second statement, the defendant initially "admitted that he had actually been involved and hit the victim with a steel pipe" before he "recanted and said that, no, he didn't actually do it." Following this recantation, the defendant "became hysterical and started crying, and at that point, it became obvious [that officers] couldn't talk to him anymore." Shortly thereafter, the defendant was booked into the jail "on a forty-eight hour hold."

Lieutenant Ragland said that he became suspicious of the defendant when the details of the defendant's statement changed over tellings. Lieutenant Ragland admitted that he was not present when the defendant first admitted striking the victim with a pipe. He said that after recanting his admission of murder, the defendant blamed the victim's murder on Wayne Bobo, Snow, and Ms. Jefferson. He said that the defendant became "hysterical" and that it was impossible to continue the interrogation. Lieutenant Ragland denied that the

-6-

defendant was upset at being accused of a crime he did not commit and said that the defendant was upset "[b]ecause he had admitted to his involvement and he knew he was up shit creek without a paddle, that's why." He said that the defendant immediately began recanting and blaming others "because that's what criminals do."

MPD Sergeant Anthony Mullins testified that he became involved in the investigation when he arrived at the scene. Later, Sergeant Mullins interviewed the defendant after the defendant was "developed as a possible suspect." He recalled that when he first came into contact with the defendant, the defendant was in Lieutenant Toney Armstrong's office. During that encounter, the defendant "could describe things in the apartment and describe things that happened and the more we asked him about what happened, he gave particular details that no one would know[] unless they committed the act." Sergeant Mullins said that upon further questioning, the defendant admitted killing the victim, telling officers,

> They went there, him and Tammy Vance, to rob [the victim], and when they got inside an argument ensued. He wanted to know, [the victim] wanted to know why they were there, how they got in his apartment, because Miss Vance had a key. And during the argument, Tammy Vance threw a container of bleach at [the victim] and then he said he struck [the victim] in the head with an iron pipe, pushed him in the bedroom and struck him again, and again, and again. Ultimately, he said, between seven and nine time[s].

Sergeant Mullins said that the defendant's statement "explained some of the things" that police had seen in the victim's apartment, like the rag in the victim's mouth, which the defendant said Ms. Vance had "stuck . . . in [the victim's] mouth to stop him from screaming." Sergeant Mullins said that when they started to take a "formal" statement the second time, the defendant "was getting some [details] wrong" such as the location of the victim's apartment. When Sergeant Mullins questioned the defendant about the mistakes, the defendant became "very upset" and said that "people have threatened him about this incident." The defendant then blamed Wayne Bobo and an individual named Miguel for the victim's murder but continued to acknowledge that he was present during the murder. During this time, the defendant was "[l]oudly crying and yelling." When it became apparent that they would be unable to obtain a statement from the defendant, they took him "down to the jail on a hold" because they "felt like" they had sufficient proof "to charge him" but "weren't prepared to charge him at that point."

Sergeant Mullins testified that officers brought the defendant to the homicide

office for another interview on the following morning. The defendant was provided *Miranda* warnings a second time. At that point, the defendant provided a statement admitting that he murdered the victim by striking him with a metal pipe "about seven or eight times on the head." He said that he went to the victim's apartment "[t]o rob him. Tammy said to ride with her to rob her boyfriend." The defendant admitted, "I struck him the first time with the pipe. She grabbed [the victim] by the mouth and shoved a face towel in his mouth." The defendant said that he did not get blood on him and that Ms. Vance threw the murder weapon into the Wolf River.

Sergeant Mullins testified that he had been trained in "basic blood stain pattern analysis," which he described as "locating, analyzing, and documenting blood stain patterns on crime scenes and then interpreting that evidence to determine what can be determined." He said that "victim location, assailant location" and "how the crime occurred" could be determined by analyzing blood stain patterns. Sergeant Mullins testified that he had been at the crime scene on a single occasion "for a matter of hours" and that the defendant's statement "was corroborated by what [Sergeant Mullins had seen] at the crime scene previously." He noted "cast-off" blood stains on the wall in the bedroom, which he described as "coming as a result of the blows" to the victim. He said, "Once a blow is given and blood is transferred from him to the instrument, every swing is going to cast blood off of that object, and in this case, a lot of it hits the surface of the wall." Sergeant Mullins also identified blood cast off on the floor and the closet door. Sergeant Mullins testified that based upon the "six distinct patterns" of blood stain, it appeared that the victim "had been hit at least six to eight times." He said that a "hard shove" would have sent the victim from the doorway of the bedroom onto the bed.

Doctor Marco Ross, the forensic pathologist who performed the victim's autopsy, testified that the cause of the victim's death was "[b]lunt force injuries of the head and asphyxia." Doctor Ross testified that the victim suffered "fractures of the skull in the right frontal area [and] the left frontal area" as well as "some fractures involving the bones around the orbit of the right eye, and the face, and a little bit on the right cheek, and the roof of the orbit on the right eye." In addition, the victim "had a fracture of the left upper canine tooth," which Doctor Ross found in "the airway of the right lung, probably in the region of the right main stem bronchus." Doctor Ross identified "some hemorrhage or material consistent with hemorrhage in the brain itself, although, due to the decomposed nature of the brain, it was difficult to precisely delineate where that hemorrhage may have originally come from." Doctor Ross noted that the victim was in "a moderately advanced stage of decomposition." Doctor Ross said that the victim "had an orange towel that was stuffed into his mouth" and that the towel pushed the victim's tongue back "and effectively block[ed]" the victim's airway. The location of the tooth in the bronchial tubes indicated that the tooth was knocked out before the rag was stuffed into the victim's mouth.

Doctor Ross testified that the victim suffered "a total of eight lacerations to the head area" and that "based upon the locations of the lacerations on the head and given the configurations of the head and face, . . . a minimum of five separate impacts to the head and face were sustained." He explained that his findings indicated that the victim suffered a minimum of five and a maximum of eight blows to the head. Toxicology testing detected "the presence of ethanol at a level of 199 milligrams per deciliter which on the breathalyzer scale is similar to a .19," but Doctor Ross cautioned that "alcohol typically forms as a result of the decomposition process."

Doctor Ross removed the victim's pacemaker device during the autopsy.

Joel Hunt, an employee in the "pacing division" of Boston Scientific, testified that he was charged with programming and trouble-shooting implantable pacemakers and defibrillators. Mr. Hunt identified the device removed from the victim as "a dual chamber, meaning it can pace and defibrillate the top chamber and the bottom chamber of the heart." By examining the data he removed via computer from the victim's pacemaker, Mr. Hunt learned that on August 20, 2007, the victim's heart rate accelerated to 205 beats per minute, activating the pacemaker, which regulated the heart rate. The victim's heart rate then accelerated to 289 beats per minute, which activated the defibrillator. The defibrillator delivered two shocks "and then, from that point on nothing else is . . . detected or sensed." On October 27, 2007, the pacemaker delivered shocks, which could have been attributed to the autopsy. Although he could not say when the victim died, Mr. Hunt could say that all heart activity ceased on August 20, 2007.

Following Mr. Hunt's testimony, the State rested.

Doctor Randy Schnell, Clinical Services Coordinator of the Memphis City Schools Mental Health Center, identified a psycho-educational evaluation performed on the defendant to determine the defendant's eligibility for special education services. The defendant's intelligence quotient ("IQ") at the time of the test in 1992 was 62, which Doctor Schnell described as "well below average" and as indicating that the defendant's "mental development would be significantly delayed compared to other children his age." He said that the defendant's IQ score "was consistent with mental retardation." The defendant's scores on the Woodcock Johnson Psychoeducational Battery and the Vineland Adaptive Behavior Scales confirmed a diagnosis of mental retardation. He said that it was "[e]xtremely unlikely" that the defendant's IQ score would have increased to normal levels by adulthood, noting that IQ scores "are reasonably stable by age fourteen," the age at which the defendant was tested.

Twenty-one-year-old Chawonna Jefferson, testified that she and the defendant

dated for several years and had a three-year-old child together. She said that at the time of the victim's death, she and the defendant lived with her mother, Snow. Ms. Jefferson said that Ms. Vance and Ms. Lucas came to live in the home in late August 2007 and that at that time the women were driving a Silverado truck. She recalled that Ms. Vance had a bruise on her head and a black eye.

The 29-year-old defendant testified that he had never met the victim. The defendant said that he only went as far as the seventh grade and that he had taken only resource classes. He testified that his only source of income at the time of the victim's murder was a Social Security Disability check of $685 per month. He said that he worked at a neighborhood store sweeping the floor and stocking shelves in exchange for "Pampers and milk to provide" for the child he had with Ms. Jefferson. The defendant recalled that he first met Ms. Vance when she and Ms. Lucas moved into the residence owned by Snow. At that time, the women were traveling in the victim's truck. He said that Ms. Vance "had a gash in the center of her forehead and her eye was black."

The defendant testified that on November 2, 2007, officers returned to the Depass Street residence and asked him, Ms. Jefferson, and Snow to return to the police station for questioning. He said that they traveled to the police station together in the family vehicle. The defendant claimed that after he had waited alone in an interview room for several hours, Lieutenant Ragland told him that Ms. Vance had implicated him in the victim's murder. He said that he told them that he had no part in the victim's death. The defendant testified that although he initially denied any knowledge of Ms. Vance's possession of the victim's handgun, he eventually told officers that he had gone with Ms. Vance and Snow to sell the gun to Wheelchair John. He said that the initial interrogation lasted "hours" and that he "got tired of sitting there." He claimed that the officers continued to scream at him for hours until he finally said, "What the f*** do you want to hear, what do you want me to tell you[?]" He said that at that point, the officers created a statement that was allegedly given by him.

The defendant testified that although he had no knowledge whether Ms. Vance had killed the victim, he told the officers that she had "probably" killed the victim because she had accused him of doing so. He said that when he was in the office, the officers showed him a live feed of Ms. Vance's interrogation and told him that she was accusing him of the murder. The defendant admitted accusing a number of others, including Snow, of being involved in the murder "just so they would just leave [him] alone."

During cross-examination, the defendant said that he had never given a statement in a criminal case prior to this one and that he had never testified in court. The defendant admitted that he had tattoos of a pitchfork and "folk," which were associated with

the Gangster Disciples. The defendant questioned the State's evidence, saying,

> The only evidence you all got against me is what Tammy said
> and that bogus statement that I gave. That's all you got. The
> detective just admitted it yesterday. If I wouldn't have said I
> had nothing to do with killing Mr. Danny Harris, I wouldn't be
> sitting here today. By me being stupid and constantly just
> allowing them to jus[t] drill me the way they did, if I would have
> just left it alone and let them deal with the[ir] job, I wouldn't be
> sitting here today. You know it and I know it.

The defendant insisted that he did not commit the crime, claiming that his statement contained only the repeated details about the crime that detectives had provided to him.

Tammy Vance testified that she pleaded guilty to first degree murder and aggravated robbery related to the victim's death. She nevertheless denied having killed the victim, whom she said she met through a chat line in January 2007. Ms. Vance testified that she lived with the victim for "about two and a half months" and that, during that time, the victim was not in good health because "all he did was drink beer and smoke cigarettes." She said that the victim gave her free access to his truck and personal finances, which came primarily from retirement benefits, so that she could manage his personal affairs. Ms. Vance claimed that the victim intended to file for bankruptcy because he could not make ends meet.

Ms. Vance testified that on August 20, 2007, she and the victim woke early to take Ms. Lucas to West Memphis to procure an identification card. She said that Ms. Lucas was addicted to crack cocaine and that the victim "kind of felt for her because he had an addiction." After concluding their business, the three went to Burger King, where the victim purchased food for Ms. Lucas. Ms. Vance said that when she told the cashier to "go ahead and keep [the change] for somebody else," the victim became "very irate" and "started beating his fists on the dashboard, slapping his hat." Despite the victim's outburst, they returned to the victim's apartment, and she prepared a fried egg sandwich for the victim's lunch. She testified that as the victim ate, "he put the sandwich down and he got up and . . . he balled up his fist and he hit me in my head and split my head wide open, and I was dazed, I fell on my knees to the floor." She said when she "came to" she found the victim and Ms. Lucas in the victim's bedroom. Ms. Vance claimed that Ms. Lucas "had hit him with a hammer in the head, and he was laid back on the bed." She said that she tried to stop Ms. Lucas, but Ms. Lucas struck the victim "a couple of times" and then struck Ms. Vance one time. According to Ms. Vance, Ms. Lucas struck the victim "a total of seven or eight times. Then when she got through with that, she took a rag and . . . put it down in his mouth."

Ms. Vance testified that Ms. Lucas' violent attack on the victim caused her to

-11-

be "in total shock" and that she "did not know what to do." She watched as Ms. Lucas poured kerosene and some "cleaning substances" over the victim's body. Ms. Vance said that she complied with Ms. Lucas' command to pack her things and that the two women left the victim's apartment in the victim's truck. Ms. Vance claimed that Ms. Lucas put the murder weapon in her bag and later disposed of it in a dumpster near a convalescent home.

The two women returned to the victim's apartment several days later to get a television and other items to pawn for money. She first met the defendant on that day. She said that she and Ms. Lucas had decided to blame the victim's murder on Wayne Bobo and that she initially did so when questioned by police. She testified that after police told her that the defendant had confessed, she blamed the defendant for the murder in order to protect Ms. Lucas. She said that "not a bit" of her statements incriminating the defendant was true.

Ms. Vance claimed that after she was charged with the victim's murder, she tried to tell her lawyer that Ms. Lucas had committed the murder. Despite her innocence, she decided to plead guilty. She said that just prior to entering her pleas, she wrote a statement exonerating the defendant and asked her attorney to give it to defense counsel.

During cross-examination, Ms. Vance acknowledged that she continued to cash the victim's checks.

Based on this evidence, the jury convicted the defendant as charged of felony murder and aggravated robbery. The trial court imposed an automatic sentence of life with the possibility of parole for the murder conviction and, following a sentencing hearing, a concurrent sentence of 20 years for the aggravated robbery conviction.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the incriminating statements he provided to police, that the trial court erred by admitting into evidence six photographs depicting the deceased victim, that the evidence adduced at trial was insufficient to support his convictions, and that the trial court committed plain error in its instructions to the jury. We consider each claim in turn.

*I. Motion to Suppress*

The defendant contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to police, claiming that the statements were obtained in violation of his constitutional rights. The State asserts that the trial court did not err by denying the motion and admitting the statements as evidence at the defendant's trial.

At the hearing on the defendant's motion to suppress his pretrial statements as involuntarily given, Lieutenant Ragland testified, as he later did at trial, that as he interviewed the defendant, "it became obvious that he knew more about the case than he was telling us and as we continued to interview him, we felt it was prudent to treat him as a possible suspect." The defendant was then advised of his rights, and he signed a waiver of rights form. Lieutenant Ragland testified that after the defendant had some difficulty reading the advice of rights form, he read the entire document aloud to the defendant. He said that the defendant never asked for an attorney, never refused to answer any questions, and never gave any indication that he did not understand the process.

Lieutenant Ragland testified that the defendant was provided several breaks to use the restroom and smoke cigarettes and that the defendant was offered food and water. He denied telling the defendant what to say, noting that the officers "just wanted the truth." Upon further questioning, the defendant admitted that he had gone to the victim's apartment to help Ms. Vance retrieve a television to pawn and that he had seen the victim's decaying corpse during that outing. Lieutenant Ragland presented that statement to Sergeant Mason, who then asked Sergeant Mullins to interrogate the defendant. Lieutenant Ragland testified that after Sergeant Mullins interrogated the defendant, he asked Lieutenant Ragland to take a "formal" statement from the defendant. In that statement, the defendant admitted killing the victim.

Lieutenant Ragland adamantly denied berating or threatening the defendant to get him to provide an inculpatory statement.

During cross-examination, Lieutenant Ragland acknowledged that he had "basically" accused the defendant of lying, telling him that his statements were inconsistent. Lieutenant Ragland said that the defendant did not tell him that he was a resource student.

Sergeant Mullins testified that he interviewed the defendant in response to the defendant's interview with Lieutenant Ragland and "[b]ased on the information [officers] were getting" from Ms. Vance. Sergeant Mullins said that when confronted with "all the information," the defendant "admitted that he was there and that he killed" the victim. Although he had knowledge of the crime scene from having visited it, Sergeant Mullins insisted that he did not relay any of that information to the defendant. He said that the details provided by the defendant during his confession matched the crime scene.

According to Sergeant Mullins, after the defendant gave the detailed confession, Sergeant Mullins sent Lieutenant Ragland to get a transcriptionist to take the "formal" statement. As they began taking the formal statement, however, the defendant "all of a sudden . . . gets it all wrong. He's not describing it the same way he described it before."

-13-

When Sergeant Mullins told him to start over again, the defendant "started panicking, becoming upset, and claiming that others had committed the crime and threatened him and threatened his family if he told anybody." Sergeant Mullins said that the defendant "started saying that Janice Jefferson, who he called mom, had done it. He said a guy named Wayne Bobo had done it. He brought a couple of Hispanic names into it. Everybody but Andrew Hayes." At that point, they "stopped the statement."

Sergeant Mullins said that even during his breakdown, the defendant never asked for an attorney, never asked for questioning to cease, and never indicated that he did not understand the waiver of rights. Sergeant Mullins testified that the defendant provided another statement after he spent several hours in the jail on a 48-hour hold. That statement, he said, was consistent with the one given before the defendant's breakdown on the previous evening. Sergeant Mullins maintained that he did not threaten the defendant or tell him what to say.

During cross-examination, Sergeant Mullins testified that officers stopped questioning the defendant when it became clear that further interrogation "would have been counterproductive for everybody." He acknowledged that they did allow Snow to confront the defendant after he implicated her in the victim's murder. He testified that he thought that Ms. Vance might have been the first to implicate the defendant, and he acknowledged that he confronted the defendant with Ms. Vance's statement. He denied telling the defendant everything that Ms. Vance had said or that the defendant was interviewed in the room adjacent to Ms. Vance.

Ms. Vance testified at the hearing that she heard detectives yelling and screaming at the defendant and using "racial slurs."

The defendant testified that he only admitted killing the victim because the officers told him he would not be released until he told them what they wanted to hear. He acknowledged that officers offered him food and drink and permitted him breaks to smoke. He claimed, however, that they told him facts about the crime and showed him pictures of the crime scene before he confessed. He also claimed that officers did not provide *Miranda* warnings until he had already provided a confession.

During cross-examination, the defendant conceded that he traveled to the police station voluntarily in his own vehicle and that he had signed two advice of rights forms.

The trial court denied the defendant's motion to suppress, concluding that "the totality of the circumstances reflects an uncoerced choice to speak with law enforcement."

-14-

The court accredited Lieutenant Ragland's testimony that he read the advice of rights form aloud to the defendant and observed that the defendant had signed two rights waivers and had initialed various parts of each incriminating statement.

On appeal, the defendant again complains that the statements were the product of law enforcement coercion. We consider the claim with a few well-settled principles in mind.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U. S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined -- a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn.

1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-6 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[2]

Upon our review, we conclude that the record simply does not support the defendant's claim of coercion. The defendant, in his late twenties, was provided with *Miranda* warnings. Lieutenant Ragland read both the warnings and the advice of rights form aloud to the defendant on at least one occasion. Although the defendant's interrogation on November 2 was lengthy and no doubt intense, no evidence supports a claim that his will to resist was overborne. He was provided breaks to use the restroom and smoke, provided with a drink, and offered food. Although this court has roundly condemned the 48-hour hold procedure utilized by the Memphis Police Department, *see, e.g., State v. Courtney Bishop*, No. W2010-01207-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Jackson, Mar. 14, 2012), the record in the present case establishes that probable cause for the defendant's arrest existed at the time he was booked into the jail on the 48-hour hold. Under these circumstances, the trial court did not err by refusing to suppress his statements.

## II. Photographs of the Victim

The defendant asserts that the trial court erred by admitting into evidence six photographs of the victim's body in an advanced state of decomposition, arguing that the photographs were more prejudicial than probative. The State contends that the photographs, although unpleasant, were not so graphic as to render them unfairly prejudicial.

"The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (quoting *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978)). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger for unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

---

[2]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

*See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949).

Although the photographs are quite graphic, the trial court did not abuse its discretion by admitting them into evidence. As the State points out, the trial court excluded 27 other photographs offered by the State at trial and admitted these six to depict specific injuries described by the medical examiner. The record does not support the defendant's assertion that the State's purpose in admitting the photographs was to inflame the jury. Photographs of a corpse in an advanced state of decomposition are inherently unpleasant, but such does not render them inadmissible per se. The defendant is not entitled to relief on this issue.

*III. Sufficiency of the Evidence*

The defendant avers that the evidence adduced at trial was insufficient to support his convictions of felony murder and aggravated robbery. The State asserts that the evidence was sufficient.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

First degree murder, as charged in this case, is "[a] killing of another committed in the . . . attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). "Aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly

weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-402(a).

Here, the jury obviously accredited the defendant's pretrial statements confessing the victim's murder in graphic detail as well as the testimony of the officers who took those statements and found the defendant's in-court denials less than credible. The defendant admitted to police that he entered the victim's apartment along with Ms. Vance with the intent to rob him and ended up killing him by striking him seven or eight times with a metal pipe. The evidence at the scene, the condition of the body, and the medical examiner's description of the victim's injuries corroborated the defendant's confession of murder. Other witnesses testified that they saw the defendant with property belonging to the victim in the months following the victim's death, corroborating his admission that robbery was the motive for the victim's death. Although Ms. Vance testified on the defendant's behalf that Ms. Lucas had murdered the victim, the jury, as was its prerogative, rejected this testimony. The evidence adduced at trial more than sufficiently established the defendant's guilt of felony murder and aggravated robbery.

## IV. Jury Instructions

Conceding that he failed to lodge a contemporaneous objection to the jury instructions provided by the trial court and that he failed to include any issue related to the jury instructions in his motion for new trial, the defendant asks this court to review the jury charge for plain error in the trial court's instructions regarding the definition of criminal responsibility for the conduct of another. The State contends that the defendant waived plenary review of the issue and that the defendant has failed to establish plain error in the instructions provided by the trial court.

Initially, as the defendant concedes, he has waived plenary consideration of any issue related to the jury instructions by failing to object to the omission at trial, *see* Tenn. R. Crim. P. 30(b); *State v. Lynn*, 924 S.W.2d 892, 899 (Tenn. 1996), and by failing to include it in his motion for new trial, *see* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989).

Whether properly assigned or not, however, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice." Tenn. R. App. P. 36(b). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the [appellate court], and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the definition of "substantial right" promulgated by this court in *Adkisson*. There, we held that "[a] 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'" *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson's* five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. To be reviewable as "plain," the error "must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original). Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

An accused's constitutional right to trial by jury, *see* U.S. Const. amend VI; Tenn. Const. art. 1, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a

complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30.

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

In its instruction on the offense of first degree murder in the perpetration of a felony, the trial court told the jury that, to convict the defendant, it must find "[t]hat the defendant or one for whom the defendant is criminally responsible unlawfully killed the alleged victim, and that the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery." The trial court did not define the concept of criminal responsibility for the conduct of another. Indeed, the trial court did not mention the concept again. During its deliberations, the jury sent the following question: "What is the meaning of criminally responsible as it applies to first degree murder associated with aggravated robbery[?]" The trial court responded, "The definition of criminal responsibility is in the jury charge, and you're going to have to find that definition. It's already there. Talks about what that means, and in fact, is there several times, all throughout the charge."

Despite the trial court's remarks, the printed instructions provided to the jury do not contain any definition or further reference to the concept of criminal responsibility. That being said, the record clearly establishes that the omission of the instruction, even if it was erroneous, was harmless beyond a reasonable doubt. The defendant was not charged under a theory of criminal responsibility for the conduct of another, and the only testimony that the victim was murdered by anyone other than the defendant came from Ms. Vance, whose testimony the jury rejected out of hand. The defendant invites us to speculate that the jury's question evinced its consideration that someone other than the defendant committed the murder, but we cannot and will not do so. Because any error in the omission of a criminal responsibility instruction was harmless beyond a reasonable doubt, the error did not adversely affect any substantial right of the defendant and consideration of the issue is not "'necessary to do substantial justice.'" *Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42).

*V. Conclusion*

The defendant has failed to establish any error by the trial court requiring reversal or that the evidence adduced at trial was insufficient to support his convictions. Accordingly the judgments of the trial court are affirmed.

-20-

_____
JAMES CURWOOD WITT, JR., JUDGE